# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-17-00713-CR

---

**Victor Noe Cortes-Puga, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 27TH DISTRICT COURT OF BELL COUNTY**
**NO. 74974, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Victor Noe Cortes-Puga guilty of aggravated sexual assault of a child under the age of six for sexually assaulting his girlfriend's five-year-old daughter. *See* Tex. Penal Code § 22.021(a)(1)(B), (2)(B), (f)(1). Appellant elected to have the trial court decide his punishment, *see* Tex. Code Crim. Proc. art. 37.07, § (2)(b), and the trial judge sentenced him to serve thirty years in the Texas Department of Criminal Justice, *see* Tex. Penal Code § 22.021(e), (f)(1). On appeal, appellant complains about the trial court's admission of certain portions of the testimony of a police detective and of a CPS investigator. We affirm the trial court's judgment of conviction.

## BACKGROUND

The evidence at trial showed that Jessica met and began dating appellant when she lived in Austin, Texas. Appellant moved in with Jessica and her three children, including her

youngest daughter J.G.[1]  The couple then moved to Mexico with the children, and Jessica became pregnant with appellant's child.  Jessica and the children returned to the United States when she was pregnant.  At that time, appellant remained in Mexico.  A few years later, the couple decided to reunite, and appellant returned to the United States in July of 2015.  After he returned, Jessica, her four children, and appellant lived with Jessica's mother, brother, and sister in Harker Heights, Texas.

One night about six weeks after appellant had returned, Jessica was sleeping in her bed with the children.  She had the children in bed with her because appellant was supposed to be out of town working.  She awoke when she heard five-year-old J.G. crying.  Thinking her daughter was having a bad dream, Jessica pulled J.G. close to comfort her.  She realized that J.G. was naked from the waist down.  Wondering why her daughter did not have her shorts or panties on, she asked J.G. if she had "went potty on herself."  J.G. said no and told her mother that "he took them off of me" and continued crying.  Jessica got up and turned on the bedroom light.  Her other children were still on the bed sleeping.  Appellant was lying on the floor next to the bed covered with a blanket from the bed.  J.G.'s shorts and panties were on the floor next to him.  Jessica sent J.G. to the bathroom.  She followed and asked her daughter what had happened.  J.G. told her mother that "he put his weenie on my cookie."  Jessica knew that her daughter called a "penis" a "weenie" and a "vagina" a "cookie."  So, she knew that her daughter meant that appellant had put his penis on her vagina.  Jessica woke up her mother to take care of the other children and took J.G. to the police station to report the incident.  Afterwards, she took her daughter to the children's hospital for an exam.

---

[1]  To protect the identities of the child victims in this case, we refer to the children using only their initials and refer to related adults by their first names.  *See* Tex. R. App. P. 9.10(a)(3).

At the hospital, a sexual assault nurse examiner (SANE) conducted a sexual-assault exam on J.G. During the history portion of the exam, J.G. told the nurse, "I was sleeping. My dad got me around him. He told me to get on him. He brought me on him." She then explained that "he touched [her]" with his "front butt" and pointed to the genital area on a body diagram of a girl to show where he touched her. J.G. told the nurse that she also called the "front butt" "his wiener" and that she called the genital area her "cookie." The SANE testified that J.G. then said, "My dad touched my cookie with his wiener." When she asked J.G. if her dad touched her on the outside or inside of her clothes, J.G. said, "Inside on my skin. My dad took off my clothes. I did not pee on myself." J.G. identified her dad as "Noe" (appellant).

During the genital exam, the SANE noted injuries to J.G.'s sexual organ: redness on both sides of the labia majora and red, irritated skin on the inner aspects of the labia majora (the labial creases on both sides) at both the top and bottom. The nurse explained that the redness and irritation could be caused by an irritant, such as urine, or by rubbing. While the nurse could give no definitive cause for the injuries to J.G.'s sexual organ, she testified that the injuries were consistent with J.G.'s description of the sexual assault. A copy of the SANE report of J.G.'s sexual-assault exam was admitted at trial without objection.

The jury also heard evidence that when Jessica took J.G. to the hospital, her sister, Brenda, who was living with Jessica, called their other sister, Victoria, who lived next door to Jessica's mother with her husband and daughter, to tell her that appellant had hurt one of the children. At that time, the nature of the injury was not discussed. Victoria learned how appellant had injured J.G. in a later phone conversation with Brenda. At that point, Victoria felt compelled to ask her nine-year-old daughter, N.C., if anybody had ever hurt her or done anything to her that she did not want them to do. N.C. initially denied that anything had happened to her. Both

3

Victoria and her husband, however, felt that N.C. was not telling the truth. Victoria explained to her daughter that she was not in trouble and that she needed to be honest about whether anything had happened. N.C. eventually disclosed to her mother that when she was at her grandmother's house playing outside with her cousins, she went inside to get a drink, and appellant pulled her into the children's bedroom, pulled off her shorts and underwear, threw her on the bed, covered her mouth with his hand, and "put his penis right next to her vagina." Victoria testified that her daughter showed her where appellant put his penis by pointing to the crease where her thigh met her genital area.

At trial, N.C. described the incident that she told her mother about, saying that appellant put his "thing"—which, she explained, is the part of a boy's body that he pees with—on the upper inside of her thigh. In court, she demonstrated where appellant's "thing" touched her by pointing to the top part of her thigh at the crease. N.C. testified that appellant did not touch her private with his "thing" but said that it was "really close" to her private. Her testimony indicated that this incident happened after appellant had returned from Mexico in July on the Sunday before school started. N.C. explained that she did not tell anyone what appellant had done because he had threatened to hurt her parents.

A few days after N.C. told her mother what appellant had done to her, N.C. agreed to talk to the police. Victoria reported the incident to the police and took her daughter for a sexual-assault exam at the children's advocacy center. N.C. told the SANE that when she went inside her grandmother's house to get juice, appellant grabbed her by her arm, threw her on the bed in the children's room, pulled down her underwear and pants, "popped it [out] and put it on [her]." N.C. pointed to the penis on a body diagram of a boy to show what "it" was. She explained that appellant touched her "on the inside [of her clothes] on [her] skin" with his private

4

part, which she called a "wiener." The nurse noted no injuries to N.C. during the exam. A copy of the SANE report of N.C.'s sexual-assault exam was admitted at trial without objection.

The evidence at trial also showed that both girls were taken, on separate days, to the children's advocacy center for forensic interviews. The girls were interviewed by different forensic interviewers, who both testified at trial. The video recordings of the forensic interviews were admitted at trial without objection. Also admitted without objection were: an anatomical drawing of a girl where J.G. had circled the sexual organ to indicate the part of her body that appellant "had hurt," an anatomical drawing of a girl with a line drawn on it to indicate where N.C. had said that appellant had "put his thing," and a picture drawn by N.C. during her forensic interview to show what the "thing" looked like and to indicate which part of it touched her body.

Appellant was charged by indictment with aggravated sexual assault of a child younger than six years of age for the incident involving J.G.[2] *See* Tex. Penal Code § 22.021(a)(1)(B)(iii) (defining aggravated sexual assault of child as intentionally or knowingly causing sexual organ of child to contact sexual organ of another person, including actor). The State called thirteen witnesses at trial: three police detectives, two who testified about interviewing appellant and one who testified about the pseudonym assigned to J.G.; the sexual assault nurse examiner, who testified about the exams she performed on both girls; Jessica, who testified about J.G.'s outcry; Victoria, who testified about N.C.'s outcry; two forensic scientists from the DPS crime lab, who testified about the forensic testing conducted in this case;[3] an

---

[2] The record reflects that appellant was indicted in a separate case for the sexual assault he allegedly perpetrated against N.C.

[3] Their testimony indicated that no semen was detected on clothing items belonging to J.G. or the swabs obtained from J.G. during the sexual-assault exam and that the only DNA present on the tested clothing items and sexual-assault swabs was contributed by J.G.

5

investigator from Child Protective Services, who testified about the CPS investigation of the sexual-abuse allegation involving J.G.; and J.G. and N.C., who described the sexual assaults that appellant had perpetrated against them. The defense called no witnesses.

The jury found appellant guilty of aggravated sexual assault of a child under the age of six as charged in the indictment. The trial court ordered a pre-sentence investigation and reset the case for sentencing. At the punishment hearing, no further evidence was presented. The trial court sentenced appellant to serve thirty years in prison. This appeal followed.

## DISCUSSION

Appellant raises two points of error challenging the trial court's evidentiary rulings. First, he contends that the trial court erred by admitting a police detective's testimony about the "indicators of deception" that appellant exhibited when he was interviewed because the testimony was inadmissible expert testimony on credibility. Second, appellant asserts that the trial court erred in admitting the CPS investigator's testimony about J.G.'s forensic interview because it was indirect hearsay.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)); *accord Rhomer*, 569 S.W.3d at 669. Further, we may not reverse the trial court's ruling unless the determination "falls outside the

6

zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley*, 493 S.W.3d at 83 ("Before a reviewing court may reverse the trial court's decision, 'it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008))). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93; *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## Testimony of Detective

At trial, Jeff Waggoner, a detective with the Harker Heights Police Department, testified about the police interview with appellant. He explained that, because he did not speak Spanish and appellant spoke only Spanish, Daniel DeLeon, the only Spanish-speaking detective in the department, interviewed appellant. Detective Waggoner was present during the interview.

After establishing that appellant had been given the appropriate constitutional warnings before the questioning started, *see Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), the prosecutor asked Detective Waggoner about his training on recognizing deception:

> Q     Now have you as a detective had training on how to recognize signs of deception?
>
> A     I have.
>
> Q     All right. Tell me about that training. What type of training have you had?
>
> A     Over my training and period at the police department—

At that point, appellant objected, complaining that "signs of deception" was "wholly speculative." The trial court asked appellant to "rephrase [his] objection," and appellant stated, "My objection is that it calls for speculation on the part of the witness and, basically, it's seeking to try and make the witness, basically, a human lie detector." The court ruled that it would allow the question about training. The prosecutor repeated the question, and the detective explained that he had acquired 400 hours of training involving kinesiology and nonverbal communication. In response to follow-up questions, he defined the concepts of "kinesiology" and "nonverbal communication."[4]

The prosecutor then asked Detective Waggoner about how detectives "use this type of training to detect deception." The detective answered, "Well, most people don't tell us the truth right off the bat." Appellant objected, asserting that "we are basically using this supposedly as a human lie detector." The trial court overruled the objection. The prosecutor prompted the detective to continue, and the detective explained:

> So with individuals not telling us the truth most of the time, as far as being a detective, the body reacts in typical ways. Not everybody is the same, but there's a lot of things that a body will do. Like I said, large pupil dilation, rapid breathing, nonverbal shaking of heads, yes but saying no at the same time.

The prosecutor then asked if "detectives use this type of training when doing an interview of a suspect," and Detective Waggoner confirmed that they do.

Turning to appellant's interview, the prosecutor asked Detective Waggoner,

---

[4] The detective testified that kinesiology is "the study of nonverbal body language. The body reacts—It's stuff you can't control: Heart rate, breathing, pupil dilation, sexual drive, stuff like that is all controlled by the atomic [sic] nervous system which means you can't do anything about it, it just happens." He explained that "'Nonverbal' is basically the stuff that you use without your words. Grandiose hand gestures for trying to get a point across. Trying to convince somebody that you've not done something or that you're [sic] without using words."

"[W]hat type of indications of deception did you see during the interview with the defendant?" Appellant objected, asserting the "same reasons." The trial court overruled the objection. Detective Waggoner then testified about the indicators of deception that he saw appellant exhibit, which included "us[ing] large open-hand gestures trying to convey that he was innocent of doing anything" "when talking about the incident itself," "extreme pupil dilation," and "[c]hanges in pitch and voice tone." After the detective testified about his observations, the prosecutor changed the topic of inquiry, questioning Detective Waggoner about the content of the interview—that is, appellant's statements—as relayed to him by Detective DeLeon.

In his first point of error, appellant contends that the trial court abused its discretion by allowing the prosecutor to elicit testimony from Detective Waggoner about the "indicators of deception" that appellant exhibited during the police interview because it was inadmissible expert testimony on credibility.

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion. Tex. R. App. P. 33.1(a)(1). To be timely, an objection must be made at the earliest opportunity or as soon as the grounds for the objection become apparent. *See Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011). In other words, the objection should be made "as soon as the [objecting party] knows or should know that an error has occurred." *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012); *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991). If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is

9

forfeited. *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008); *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997).

Here, the earliest possible opportunity for appellant to have objected to evidence relating to signs or indicators of deception that appellant exhibited during the interview was when the prosecutor asked Detective Waggoner if he had training on "how to recognize signs of deception" after establishing that the detective had participated in appellant's interview. Appellant did not object. The detective answered the question, confirming that he had such training, and the prosecutor then propounded the next question, asking the detective to describe his training. Only when Detective Waggoner began to answer that follow-up question did appellant interrupt to object. Similarly, when the prosecutor later asked Detective Waggoner how detectives "use this type of training to detect deception," appellant waited to object until after the detective answered that "most people don't tell us the truth right off the bat." Only when the prosecutor subsequently asked the detective about the "indications of deception" that he saw appellant exhibit during the interview did appellant timely object. Thus, while appellant complains that Detective Waggoner testified "at length over [appellant]'s repeated objections to nonverbal indicators of deception that persons may display and then explained how [appellant] had displayed several indicators of deception during his interrogation," only the latter testimony—about the indicators of deception that the detective saw appellant exhibit during the interview—was timely objected to.

However, to preserve a complaint for appellate review, the point of error raised on appeal must comport with the objection made at trial, or error is not preserved. *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016); *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014). The record here demonstrates that the basis of appellant's objection to the

10

detective's testimony about the signs or indicators of deception was speculation. Appellant's initial objection asserted that the testimony "call[ed] for speculation" and sought to "make the witness . . . a human lie detector." At that time, appellant did not argue that the testimony should be excluded because it constituted inadmissible expert testimony about credibility. Nor did he raise any such argument in his later objections, which both related back to his initial objection based on speculation. The second objection simply asserted again that "we are basically using this supposedly as a human lie detector" using the same language used in his speculation objection. The third objection merely asserted that he objected for the "same reasons."

The ground for appellant's complaint about inadmissible expert testimony—that the detective's testimony about the signs of deception appellant exhibited during the interview was inadmissible expert testimony on credibility—was or should have been apparent when the prosecutor asked Detective Waggoner whether he had training on recognizing signs of deception when discussing appellant's interview. But appellant did not object on that ground. Instead, he only complained that the testimony called for speculation.

Appellant contends that his use of the phrase "human lie detector" invoked *Yount v. State*, in which the Court of Criminal Appeals held that "Rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful." 872 S.W.2d 706, 712 (Tex. Crim. App. 1993). He notes that in explaining its reasoning, the court observed that "[e]xperts on child sexual abuse are not human lie detectors." *Id.* at 710 (quoting John E.B. Meyers, et al., *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb. L. Rev. 1, 121 (1989)). Appellant maintains that his use of the phrase "human lie detector" sufficed to present his complaint about inadmissible expert testimony on credibility to the trial court and preserve it for appellate review.

11

We agree that no "magic words" or citation to specific statutes or rules are required to preserve a complaint for appeal. *Ex parte Marascio*, 471 S.W.3d 832, 842 (Tex. Crim. App. 2015); *Pena*, 353 S.W.3d at 807. However, while it is true that courts "have long eschewed hyper-technical requirements for error preservation" and that one "need not employ 'specific words or technical considerations' to avoid forfeiting their complaints," *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016), the objecting party must "let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Id.* A party must convey the substance of the complaint to the trial court clearly enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error. *Marascio*, 471 S.W.3d at 842; *Pena*, 353 S.W.3d at 807. "[A] general or imprecise objection will not preserve error for appeal unless 'the legal basis for the objection is *obvious* to the court and to opposing counsel.'" *Vasquez*, 483 S.W.3d at 554 (quoting *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)) (emphasis in original). We are not persuaded that it was obvious from appellant's use of the phrase "human lie detector" that appellant was complaining that Detective Waggoner's testimony about the indicators of deception that appellant exhibited during the interview was inadmissible because it was expert testimony on credibility. While appellant used the phrase "human lie detector" in his objection, he did so in connection with asserting that the testimony called for speculation.

Nevertheless, even assuming that appellant's use of the phrase "human lie detector" can be construed as raising a complaint that the detective's testimony was inadmissible expert testimony on credibility, and assuming arguendo that this evidence was inadmissible for that reason and, thus, that the trial court abused its discretion in admitting the testimony, we conclude that the error is harmless.

The erroneous admission of evidence is non-constitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* Tex. R. App. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 93. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas*, 505 S.W.3d at 926 (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *see Gonzalez*, 544 S.W.3d at 373. We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance the error did not influence the jury or influenced the jury only slightly. *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 93.

In assessing potential harm, our focus is not on whether the outcome of the trial was proper despite the error but on whether the error had a substantial or injurious effect or influence on the jury's verdict. *Barshaw*, 342 S.W.3d at 93–94; *Sandoval v. State*, 409 S.W.3d 259, 287–88 (Tex. App.—Austin 2013, no pet.). We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Barshaw*, 342 S.W.3d at 93; *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (in conducting harm analysis "we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence"). In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the

complained of error. *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 94; *Motilla v. State*, 78 S.W.3d 352, 356–58 (Tex. Crim. App. 2002).

Here, Detective Waggoner testified only very briefly about the signs of deception that appellant exhibited during the interview. The entirety of the testimony relating to the detective's training on recognizing deception as well as his testimony about the signs of deception that appellant exhibited during the interview was elicited in less than four pages of the State's twenty-four-page direct examination of the detective. Significantly, the State did not emphasize the detective's testimony about the behavior that he observed beyond introducing it. The State did not mention Detective Waggoner's testimony about appellant's behavior indicating deception at all during the rest of trial, and the prosecutors did not mention it during closing argument. Although the State did discuss appellant's interview during its closing argument, the prosecutor did not mention the detective's testimony about appellant's behavior during the interview or the signs of deception that he allegedly exhibited. Instead, the State discussed the content of appellant's statements, emphasizing that appellant's story, presented in the recording of the interview, "[did]n't make a lot of sense" and failed to explain why J.G. was naked from the waist down when Jessica awoke to find her crying.

Concerning the nature of the evidence supporting the verdict, the jury considered evidence that on the night of the offense, immediately after the incident, Jessica awoke to her five-year-old daughter crying and discovered that J.G. was naked from the waist down. When Jessica asked questions to discern what was going on, J.G. denied that she had had an accident— and the evidence reflected that there was no wet spot on the bed—and told her mother that appellant had "put his weenie on [her] cookie." The jury also heard details about the incident from J.G. during her testimony, and she provided specific facts about when the incident

14

happened, where it happened, what she was doing, what appellant did, how appellant touched her, and how she felt.

As for additional evidence indicating guilt, the sexual assault nurse examiner testified about the details of the incident that J.G. recounted to her during the sexual-assault exam, and the record reflects that those details were consistent with J.G.'s outcry to her mother and her testimony at trial. Further, the results of the sexual-assault exam corroborated J.G.'s account of the sexual assault. The nurse described injuries to J.G.'s sexual organ that were consistent with the sexual assault J.G. recounted. The jury also heard evidence that appellant attempted to perpetrate similar conduct, during the same time frame, with J.G.'s nine-year-old cousin, N.C. Both girls, in separate interviews, gave similar descriptions of appellant putting his "wiener" on or near their sexual organ, touching them under their clothes on their skin, and the evidence demonstrated that the girls had not spoken to each other about appellant's conduct before giving their separate accounts of appellant's sexual assaults against them.

On this record, we conclude that the admission of the challenged portions of the detective's testimony about appellant exhibiting signs of deception during his interview—if it was error and was properly preserved for appellate review—did not influence the jury or had but a slight effect. Thus, because it did not affect appellant's substantial rights, it was harmless. We overrule appellant's first point of error.

**Testimony of CPS Investigator**

Shelby Foster, an investigator with Child Protective Services, testified at trial about the investigation of the sexual-abuse allegation against appellant that she conducted on behalf of the Texas Department of Family and Protective Services. She indicated that, as part of

15

that investigation, she observed the forensic interview of J.G. at the children's advocacy center. The prosecutor asked Foster, "Without telling us what her words were, does [J.G.] make some type of outcry of sexual abuse involving—." Appellant interrupted the question to object, complaining that "[the question] calls for hearsay. Just not the specific words, but it is effectively calling for hearsay." The following exchange ensued:

PROSECUTOR: If it is not words it is not hearsay.

APPELLANT: The question assumes that, Your Honor.

THE COURT: The question was: Was a report made? You may answer that question.

The prosecutor repeated the question, and Foster confirmed that J.G. made "an outcry of some type of sexual abuse" during the forensic interview. In his second point of error, appellant argues that the trial court erred by allowing this testimony because it constituted inadmissible indirect hearsay.

Hearsay is a statement, other than one made by the declarant while testifying at a trial, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is generally inadmissible except as provided by the rules of evidence or statute. Tex. R. Evid. 802. The hearsay prohibition cannot be circumvented by eliciting the substance of the statement in indirect form. *Schaffer v. State*, 777 S.W.2d 111, 113 (Tex. Crim. App. 1989). If the content of a statement is presented by implication, such "backdoor hearsay" is subject to the same rules and limitations as the more common form of hearsay. *Cerda v. State*, No. 03-12-00582-CR, 2014 WL 4179359, at *2–3 (Tex. App.—Austin Aug. 22, 2014, pet. ref'd) (mem. op., not

16

designated for publication); *Gilbert v. State*, 874 S.W.2d 290, 295 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see Schaffer*, 777 S.W.2d at 113.

Whether testimony violates the hearsay prohibition necessarily turns on how strongly the content of an out-of-court statement can be inferred from the context; the question is whether the strength of the inference produces an "inescapable conclusion" that the evidence is being offered to prove the substance of an out-of-court statement. *Head v. State*, 4 S.W.3d 258, 261–62 (Tex. Crim. App. 1999); *Cerda*, 2014 WL 4179359, at *2. "An analysis of whether the impermissible inference is so overriding as to fall within the hearsay prohibition will necessarily turn on the specific factual circumstances of a given case." *Head*, 4 S.W.3d at 262 n.4.

In his brief, appellant complains that "the prosecutor's sole purpose for asking Foster whether J.G. 'ma[d]e an outcry of some type of sexual abuse' was to convey to the jury that J.G. told the forensic interviewer that someone had sexually abused her."

As an initial matter, we observe that an out-of-court statement that is not offered for the truth of the matter asserted, but for some other reason, is not hearsay. *Guidry v. State*, 9 S.W.3d 133, 152 (Tex. Crim. App. 1999); *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995). "An extrajudicial statement . . . which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins*, 894 S.W.2d at 347 (citing *Crane v. State*, 786 S.W.2d 338, 351 (Tex. Crim. App. 1990); *Porter v. State*, 623 S.W.2d 374, 385 (Tex. Crim. App. 1981); and *Nixon v. State*, 587 S.W.2d 709, 711 (Tex. Crim. App. 1979)). Here, the context of the questioning indicates that the State offered Foster's testimony about J.G.'s outcry statement to explain the investigative actions taken by CPS. Thus, it would not be outside the zone of reasonable disagreement for the trial court to find that the testimony was not offered to prove the truth of the

17

matter asserted in J.G.'s outcry (that appellant sexually assaulted J.G. in the manner that she described) but instead was being offered to provide the jury with relevant background information concerning the circumstances surrounding the CPS investigation (the fact that J.G. made an outcry) to explain the efforts Foster made to ensure the safety of the children and why she made them.

Moreover, hearsay by inference, or "backdoor hearsay," violates the prohibition against hearsay because it presents the content or substance, indirectly, of the out-of-court statement. Here, the complained-of testimony did not convey the content of J.G.'s out-of-court statements, even by implication. In no way did Foster convey any specific details about what J.G. disclosed during the forensic interview or impart any of J.G.'s descriptions of the sexual-assault incident. Rather, Foster's testimony merely conveyed, in a general way, that an allegation of sexual abuse had been made. She simply confirmed that J.G. made an outcry statement, which dictated how she proceeded with her CPS investigation. This is comparable to a police officer testifying that the police received a report of a particular crime and, based on that report, conducted an investigation. The prohibition against indirect or backdoor hearsay does not prohibit a witness from testifying about actions she took in response to an out-of-court statement, but only from detailing the contents of the statement when doing so. *See Schaffer*, 777 S.W.2d at 114–15 (holding it was permissible for police officer to testify that officer was acting in response to "information received," but officer was not permitted to relate historical aspects of case, which were replete with hearsay statements); *Dunbar v. State*, No. 03-12-00315-CR, 2014 WL 2741237, at *5 (Tex. App.—Austin June 13, 2014, pet. ref'd) (mem. op., not designated for publication) ("Witnesses are generally allowed to explain that an out-of-court statement caused the witness to take a particular action so long as the testimony does not strongly imply the content of the

18

out-of-court statement."); *see, e.g.*, *Trevino v. State*, No. 03-17-00156-CR, 2017 WL 5119190, at *2 (Tex. App.—Austin Nov. 3, 2017, pet. ref'd) (mem. op., not designated for publication) (explaining that trial court could have reasonably concluded that officer's testimony relaying complaints made by area residents was offered to explain why police had decided to conduct prostitution sting operation in that area).

Furthermore, the test for "backdoor hearsay" is whether the "'State's *sole intent* in pursuing [a] line of questioning was to convey to the jury' the contents of out-of-court statements." *Head*, 4 S.W.3d at 262 (quoting *Schaffer*, 777 S.W.2d at 114). Because the content of J.G.'s out-of-court statements was not impliedly presented in Foster's testimony, and given the context in which the CPS investigator's testimony was elicited, we are unable to conclude from the record that the State's sole intent in offering the complained-of testimony was to convey the content or substance of J.G.'s out-of-court statements. *See id.* (concluding that trial court could have reasonably determined that State's intent in questioning witness was not solely to convey out-of-court statement).

Accordingly, for the above reasons, we conclude that the trial court did not abuse its discretion in allowing the complained-of testimony of the CPS investigator. We overrule appellant's second point of error.

## CONCLUSION

Having concluded that the admission of the complained-of portion of the detective's testimony about the indicators of deception that appellant exhibited during the police interview, if it was error and was properly preserved for appellate review, was not harmful and that the trial court did not abuse its discretion by admitting the complained-of portion of the CPS

19

investigator's testimony about J.G.'s forensic interview, we affirm the trial court's judgment of conviction.

_____

Edward Smith, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   August 7, 2019

Do Not Publish